**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
ST. JOHN'S UNIVERSITY,

|                                      |                               |
|--------------------------------------|-------------------------------|
| *Plaintiff,*                         | -cv-_____(      )         |

- against -

|                                                                                 |                              |
|---------------------------------------------------------------------------------|------------------------------|
| TIMOTHY CONNICK, BARBARA DEINHARDT,                                              | **DECLARATION OF**           |
| ROSEMARY TOWNLEY, LAURA DELANEY, and                                            | **LINDA SHANNON**            |
| JOSEPH O'DONNELL in their capacity as Officials of the                          | **IN SUPPORT OF**            |
| New York State Public Employment Relations Board, and                           | **PLAINTIFF'S**              |
| the NEW YORK STATE PUBLIC EMPLOYMENT                                             | **PRELIMINARY**              |
| RELATIONS BOARD                                                                 | **INJUNCTION MOTION**        |

*Defendants*.
-------------------------------------------------------------------------X

I, Linda Shannon, declare, pursuant to 28 U.S.C. § 1746 and Local Civil Rule 1.9, that the following is true and correct:

1.      I am the Vice Provost and Chief of Staff of St. John's University ("St. John's" or the "University"). I joined St. John's on or about October 16, 1995.

2.      In my capacity as Vice Provost and Chief of Staff, I am responsible for oversight of the Office of the Registrar, Academic Compliance, the Center for Faculty Development and Success, the Office of Institutional Research, and the Office of Academic Data Solutions.

3.      Through my role, I have also been involved in collective bargaining and labor relations with the Faculty Association at St. John's University (the "FA") and the St. John's Chapter of the American Association of University Professors (the "AAUP") (collectively, the "Union").

4.      I am fully familiar with the facts set forth herein. I submit this declaration, on personal knowledge, in support of Plaintiff's motion for a preliminary injunction.

**History of the Union at St. John's**

5.  The presence of a faculty union at St. John's dates back to the late 1960s.

6.  On or about December 22, 1969, and January 12, 1970, the FA and AAUP, respectively, filed petitions with the New York State Labor Relations Board ("SLRB")—the predecessor to the Public Employee Relations Board ("PERB")—to represent faculty at St. John's. Attached hereto as Exhibit A is a true and accurate copy of the SLRB Certification.

7.  On or about April 22, 1970, the Union was certified by the SLRB as the exclusive bargaining representative for all full time and regular part time faculty at St. John's. The Union has remained the exclusive representative for this unit prior to the University's withdrawal of recognition on or about February 19, 2026.

8.  On or about July 1, 1970, the parties entered into their first Collective Bargaining Agreement ("CBA"). Since that date, St. John's and the Union entered into successor CBAs until the most recent Agreement expired on or about June 30, 2025.

**Entanglement of Bargaining Topics and St. John's Religious Mission**

9.  Since the Union's certification, the University's Catholic and Vincentian Mission has become inextricably entangled with the parties' bargaining relationship.

10.  St. John's Mission Statement is incorporated into the parties' CBA in Section 2.01. Attached hereto as Exhibit B is a true and accurate copy of the Parties CBA that expired on or about June 30, 2025.

11.  Section 1.06 of the CBA incorporates the University Statutes. St. John's University Statutes dictate how the University is governed, including in matters that implicate its Mission, such as curricular, disciplinary and hiring decisions. Attached hereto as Exhibit C is a true and accurate copy of the University Statutes that were in effect from May 2025–May 2026.

12.     The Statutes address many terms and conditions of employment of faculty members. Historically, St. John's would notify the Union of changes to the statutes that affected terms and conditions of employment, but over the years the Union used this process to block proposed changes, including those that directly impacted the University's Mission.

13.     Through bargaining, the Union has demanded and obtained changes to the Statutes that significantly constrain areas of St. John's internal governance with respect to its Mission.

14.     The bargaining process has, therefore, forced St. John's to negotiate with the Union over subjects that are integral to its Mission; and resulted in changes to faculty's employment terms that limit St. John's authority regarding matters essential to its Mission.

### University Statute Provisions Impacting University Action

15.     Due to bargaining, many provisions of the University Statutes now have an impact on St. John's authority to make decisions consistent with its Mission, including:

16.      Section 4.06 (Department Personnel and Budget Committee). This section institutes a committee made up of five faculty members that has the "primary responsibility: (1) to formulate department policy; (2) to administer such policy with respect to faculty recruitment, appointments, reappointments, promotions and the conferral of tenure; and (3) to review budget requests prepared by the Chairperson." This Section limits St. John's ability to hire, promote or confer tenure or set department policy consistent with its Mission. (Ex. C, Sec. 4.06.)

17.     Article 5 (School Governance). This article grants significant authority over the University's schools and colleges to faculty-filled councils, which have the right to formulate personnel, educational, curricular, admission and graduation policies. If the University wants to create a degree program, including theology, philosophy or ethics degrees, it would need to pass through this committee before the University's decision could move forward. This impedes St.

John's ability to govern according to its Mission by involving unionized faculty in educational and governance decisions that are required for the Mission, e.g., reviewing courses that teach Catholic and Vincentian values. (*Id.,* Art. 5.)

18.     Section 6.10 (University Core Curriculum Council). This section creates a council made up of eighteen (18) faculty members that is "vested" with significant "[l]egislative authority over the University-wide Core Curriculum," including with respect to courses and research. St. John's Core Curriculum serves as one of the main ways the University teaches Catholic and Vincentian values to its students. The University therefore does not have the sole authority over Mission-related core courses or how its teachers educate and form students in our faith. (*Id*., Sec. 6.10.)

19.     Section 9.04 (Members of the Congregation of the Mission). This section subjects faculty members who are members of the "Congregation of the Mission" to the same contractual "rights and duties" as all other faculty members. St. John's is, therefore, constrained in how it interacts with its own ordained ministers, exposing St. John's to the grievance process and a third-party, non-Catholic adjudicator if the Union disagrees with a decision St. John's makes affecting priests.  (*Id*., Sec. 9.04.)

20.     Section 10.05 (Committee on Mediation of Allegations Against a Faculty Member). This section requires that any discipline, suspension, or removal of a faculty member be mediated before a committee of five faculty members. The University must "consult" with this committee "to reach a mutually satisfactory resolution" prior to escalation of "charge(s)" against faculty members. These requirements insert the faculty and Union into a critical step of the discipline process, delaying and possibly inhibiting the University in its issuing of discipline and resolution

of personnel issues that implicate its Mission, such as discipline for research or other conduct that violates St. John's values. (*Id.*, Sec. 10.05.)

21.     Section 10.08 (Hearing Procedure). After mediation, St. John's is required to delegate hearing authority to a Committee on Hearing and Deciding Charges Against a Faculty Member, composed of five faculty members. Among other things, the Committee has the power to "consider the formal charges," "determine the order of proof," "conduct the questioning of witnesses," "secure the presentation of evidence," and request briefing from St. John's or the Union. Through this provision, unionized faculty effectively sit in judgment of the University's personnel decisions, including decisions for violations of St. John's Mission. (*Id.*, Secs. 10.07, 10.08.)

22.     Since these CBA provisions and University Statutes (among others) affect conditions of employment, under the New York State Employment Relations Act ("SERA"), the University cannot unilaterally remove or change them without bargaining with the Union or being exposed to a grievance or potential PERB charge. From my experience, this has limited and would continue to limit St. John's ability to manage the University consistent with its Catholic and Vincentian Mission.

### Union Obstruction of the University's Mission

23.     In recent years, the Union began taking advantage of procedures outlined in the University Statutes and other collectively bargained provisions to obstruct the University's ability to make core managerial decisions, including decisions that impact the University's ability to effectuate its Mission.

24.     The College of Pharmacy and Health Sciences ("CPHS") is a community-focused school of health that is central to the University's Mission, following in the footsteps of St. Vincent de Paul, who organized hospitals for the poor.

25.     In 2017, faculty members serving on the CPHS Faculty Council, under Article 5 of the University Statutes, refused to implement changes to the curriculum and credit allocations for a Doctor of Physical Therapy ("DPT") Program. The changes that the faculty members refused to implement were directed by CPHS's accreditor, and the failure to implement those changes ultimately led to inflated program costs, low enrollment, and the closure of the DPT Program.

26.     In 2019, the University sought to create a Master of Science in Health Sciences Program in partnership with Tiber Health and Ponce Health Sciences University in Puerto Rico. However, faculty members serving on the CPHS Faculty Council—again, under Article 5 of the University Statutes—prevented the University from doing so, refusing to (i) make required curriculum changes or (ii) allow adjunct faculty to teach courses. That prohibition by the Faculty Council led to the collapse of the program and partnership.

27.     In 2022, the Accreditation Review Commission on Education for the Physician Assistant ("ARC-PA"), an accrediting body, (i) placed the University's Physician Assistants' Program ("PA Program") on probation and (ii) directed the University to implement in-class surveys to resolve issues underlying the probation decision. CPHS Dean Anne Lin therefore sought to enforce the ARC-PA's directions to remove the school from probation.

28.     On or about September 6, 2023 the Union filed a grievance opposing Dean Lin's attempt to implement the ARC-PA's direction. Attached hereto as Exhibit D is a true and accurate copy of the September 6, 2023 Pharmaceutical Sciences Department Grievance. The Union claimed that Section 12.01 of the CBA, which limited the disclosure of course evaluations to

faculty members and Department Chairs, prohibited sharing the faculty surveys/evaluations with the ARC-PA—notwithstanding the fact that the continuing viability of the PA Program depended upon instituting the requested evaluations—and directed faculty to refrain from teaching applicable PA Program courses.

29.     Similarly, Dean Lin sought to review course evaluations to determine why the Pharmaceutical Sciences Department had been failing students at an unprecedented level, leading to a high rate of need for summer courses. The Union similarly objected, claiming that Dean Lin's attempt to investigate the pedagogical success of the Pharmaceutical Department—through a review of course evaluations—violated the CBA.

30.     On information and belief, from 2023–24, on the advice of the Union, faculty members in the University's Department of Nursing—another program central to the University's Mission—began ignoring the direction of the Department of Nursing Chair. The Union's advice led to the following: (i) obstruction of three potential faculty reappointments; (ii) resignations of two faculty members; (iii) resignation of the Department Chair; and (iv) the delay of accreditation by the Commission on Collegiate Nursing Education ("CCNE") with respect to certain Department of Nursing courses.

31.     In November 2024, the Union filed a grievance challenging the stipend offered to the Director of an Audiology Doctoral Consortium—a program run in partnership with Hofstra University and Adelphi University. The Audiology Program and its Director rotate each year between the three schools, with the host-school paying the Director's stipend at a rate agreed upon by the institutions. In the 2024–25 Academic Year, St. John's hosted the Audiology Consortium. When that stipend exceeded an amount outlined in CBA, Appendix K, the Union sought to prevent

the University from running the Program if the Director's stipend was not reduced. Attached hereto as Exhibit E is a true and accurate copy of the November 2024 Audiology Grievance.

32.    In 2026, the Union refused to discuss increasing the number of non-tenure (contract) faculty permitted under Section 3.02 of the CBA, which prevented the University from offering new courses, programs, and degrees.

33.    On or about February 2, 2026, Union President Chris Denny ("Union President Denny") threatened to file "an unfair labor practice" charge if the University "attempt[ed]" to hire faculty exceeding the number permitted under Section 3.02 of the CBA.  Attached hereto as Exhibit F is a true and accurate copy of Union President Denny's February 2, 2026 ULP Correspondence.

34.    On or about February 2, 2026, Union President Denny advised the University that faculty members were withdrawing from the Union-Administration Statute Revision Working Group. Attached hereto as Exhibit G is a true and accurate copy of Union President Denny's February 2, 2026 Working Group Correspondence. Critically, that group had been tasked with addressing ways in which the Statutes impede St. John's autonomy with respect to its Mission.

35.    The Union's obstruction of the University's ability to offer courses, programs and degrees targets the University's core religious Mission to provide an education for all people, especially those lacking economic, physical, or social advantage.

36.    The Union's obstruction demonstrated to the University that the Union could—and would—prevent St. John's from taking the same action regarding any subjects, even those most central to its Mission. For example, an attempt to create a new theology course or a program related to the ordination of priests could similarly be met with Union resistance. The Union has provided no assurance that action with respect to such matters of faith would be respected.

37.    The University realized that its ability to make decisions central to its religious Mission was compromised and these bargained-for shared governance procedures chilled St. John's exercise of its right to pursue its Mission.

## Current CBA Negotiations

38.    The most recent CBA expired on or about June 30, 2025. The parties began negotiations over a new contract on or about February 25, 2025. However, the parties were unable to reach an agreement prior to expiration.

39.    On or about October 6, 2025, the Union filed an unfair labor practice charge with PERB alleging that St. John's failed to comply with an information request, in violation of SERA. Attached hereto as Exhibit H is a true and accurate copy of the October 6, 2025 Charge.

40.    On information and belief, this marked the first PERB charge that the Union filed against St. John's since the Union's certification in 1970.

41.    On or about November 14, 2025, St. John's filed an Answer to the Charge. St. John's asserted in its answer that PERB lacks jurisdiction over the University under the First Amendment.  Attached hereto as Exhibit I is a true and accurate copy of St. John's November 14, 2025 Answer.

42.    On or about December 22, 2025, the Union withdrew the October 6, 2025 Charge. Attached hereto as Exhibit J is a true and accurate copy of the Union's withdrawal of its charge.

43.    As the Union's encroachment on internal governance over the years was gradual, it was not until the Union's recent intensified obstruction of Mission-related educational programs and its invocation of PERB's jurisdiction that St. John's realized it was compromised in its ability to make decisions in pursuit of its religious Mission. Therefore, on or about February 19, 2026, St.

John's withdrew recognition of the Union. Attached hereto as Exhibit K is a true and accurate copy of the Withdrawal of Recognition Letter.

44. After withdrawing recognition from the Union, St. John's sent an email that same day informing the University community of its decision to withdraw recognition. Attached hereto as Exhibit L is a true and accurate copy of that email.

45. On or about February 23, 2026, St. John's also sent a communication to University faculty regarding its withdrawal of recognition. Attached hereto as Exhibit M is a true and accurate copy of the Faculty Withdrawal Communication.

46. Prior to withdrawing recognition, St. John's considered whether there were narrower approaches other than withdrawal that would have safeguarded its freedom needed to implement its Catholic and Vincentian Mission, such as by trying to negotiate a CBA "management rights" clause giving St. John's the right to make decisions related to its Mission, Catholic faith or Vincentian values.

47. The University determined that seeking to add such language to the CBA would not safeguard its First Amendment rights even in the unlikely event that the Union were to agree to it. Instead, during every negotiation, the University would have been forced to bargain over what qualifies as a management decision necessary to uphold its Mission, Catholic faith or Vincentian values; and any dispute over this during the term of the CBA would be decided by a third-party arbitrator or PERB, and not a religious authority equipped to handle these matters— such as the University's President (an ordained priest) or the Congregation of the Mission. Further, even if the Union agreed to such a provision, a management rights clause is a waiver of a union's right to bargain and becomes a nullity upon the expiration of any collective bargaining agreement,

making the University's constitutional rights subject to Union acquiescence during negotiation for every successor agreement.

48. As a result, St. John's determined that it had no choice but to withdraw recognition; otherwise, the University's First Amendment rights would be contingent on whether it could obtain and retain those rights through collective bargaining.

49. St. John's made this decision to ensure the long-term strength and sustainability of the University, including its ability to act in accordance with its Catholic and Vincentian identity and execute its 2025–28 Strategic Plan, which calls on the University to foster "rational, spirited inquiry and intelligent reflection in touch with the Catholic intellectual tradition." Attached hereto as Exhibit N is a true and accurate copy of the 2025–28 Strategic Plan.

50. Recognizing the continued need to support and collaborate with its faculty, St. John's instituted a new governance model in place of the CBA. That model will be guided by a forthcoming Faculty Handbook and the University Statutes, providing faculty a voice in relevant academic University matters, consistent with its Catholic and Vincentian values.

51. With this governance change, the University improved certain terms and conditions of employment. Specifically, St. John's (i) instituted raises for faculty through Academic Year 2027–28 (between 3% and 3.25% each Academic Year); (ii) increased contributions to the University's Health Insurance Premium Fund ($476,010) and the Supplemental Health Insurance Fund ($145,000 by 2028); (iii) instituted an Adjunct Faculty Health Insurance Premium Assistance Program ($100,000); and (iv) reinstated the Annual Recognition Awards ($125,000). These changes were made to safeguard St. John's Mission and to continue supporting faculty irrespective of PERB jurisdiction.

52.　On or about April 13, 2026, the Union filed an unfair labor practice charge with PERB alleging that St. John's, in sum, (i) refused to recognize and bargain with the Union, (ii) unilaterally changed terms and conditions of employment, (iii) circumvented the union, and (iv) interfered with and surveilled protected activity, all in violation of SERA. Attached hereto as Exhibit O is a true and accurate copy of the April 13, 2026 Charge.

53.　The University cannot operate consistent with its Mission if it needs to share, or have scrutinized, internal management decisions regarding its Core Curriculum, hiring, tenure, discipline, or any other decision regarding faculty central to its Catholic and Vincentian faith with a government agency or the Union.

54.　Our Catholic and Vincentian faith leaves those decisions solely in the hands of the Catholic Church and the Congregation of the Mission.

55.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed On:  New York, New York
                        May 28, 2026

_Linda Shannon_ _(signature)_

Linda Shannon